2018R00919/DCH

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Madeline Cox Arleo |
| | : | |
| | : | Crim. No. 2:20-cr-00773 |
| v. | : | |
| | : | 18 U.S.C. §§ 1349, 1347, 1035, and 2 |
| | : | |
| ADARSH GUPTA | : | |

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

### COUNT ONE
(Conspiracy to Commit Health Care Fraud)

1.  At all times relevant to this Indictment:

    a.  Defendant ADARSH GUPTA resided in Toms River, New Jersey, and was a medical doctor licensed to practice in New Jersey and Arizona. ADARSH GUPTA worked as an independent contractor for the AffordAdoc Network telemedicine companies, described below.

    b.  Creaghan Harry, a coconspirator not charged in this indictment, was a United States citizen who resided in Highland Beach, Florida, and owned and operated the AffordADoc Network.

    c.  Lester Stockett, a coconspirator not charged in this indictment, was a United States citizen who resided in the country of Colombia and owned and operated the AffordADoc Network.

2

d. The AffordADoc Network was a group of purported telemedicine companies owned and operated by Creaghan Harry and Lester Stockett. The AffordADoc Network included the following Delaware corporations: PCS CC, LLC ("Procall"), a call center company that purported to do business throughout Latin America, including in Colombia; Telehealth Doctor's Network, LLC (dba "Video Doctor USA"), a purported telemedicine company that did business throughout the United States; and Telemed Health Group, LLC (dba "AffordADoc"), a purported telemedicine company that did business throughout the United States.

### The Medicare Program

e. The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 years or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received Medicare benefits were referred to as Medicare beneficiaries.

f. Medicare was a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program," as defined in Title 18, United States Code, Section 24(b).

g. Medicare was divided into four parts which helped cover specific services: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

h. Specifically, Medicare Part B covered medically necessary physician office services and outpatient care, including the ordering of durable medical equipment, prosthetics, orthotics, and supplies, such as Off-The-Shelf

3

("OTS") ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively "braces"). OTS braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual.

i. CMS contracted with various companies to receive, adjudicate, process, and pay Part B claims, including claims for braces. CMS also contracted with the Program Safeguard Contractor, or ZPIC, which were contractors that investigated fraud, waste, and abuse. As part of an investigation, the Program Safeguard Contractor or ZPIC could conduct a clinical review of medical records to ensure that payment was made only for services that met all Medicare coverage and medical necessity requirements.

j. Brace companies, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

k. If Medicare approved a provider's application, Medicare assigned the provider a Medicare Provider Identification Number ("PIN" or

"provider number"). A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included the PIN assigned to that medical provider. Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

    l.    Under Medicare Part B, claims for braces were required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury. Medicare used the term "ordering/referring" provider to identify the physician or nurse practitioner who ordered, referred, or certified an item or service reported in that claim. Individuals ordering or referring these services were required to have the appropriate training, qualifications, and licenses to provide such services. A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, the name and identification number of the physician or other health care provider who had ordered the services, and the name and identification number of the brace provider that had provided the services. Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers.

    m.    To be reimbursed from Medicare for braces, the items or services had to be reasonable, medically necessary, documented, and actually provided as represented to Medicare. Medicare would not pay claims procured through kickbacks and bribes.

5

n.  Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare required complete and accurate patient medical records so that Medicare could verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.

o.  According to Local Coverage Determination ("LCD") for Knee Orthoses (L33318), which was adopted nationally for services performed on or after October 1, 2015, knee braces, including L1381, L1386, L1832, L1833, L1843, L1845, L1850, L1851, and L1852, required an in-person examination of the patient. The LCD states that knee braces were medically necessary only where knee instability was documented by an in-person examination of the beneficiary and objective description of joint laxity (*e.g.*, varus/valgus instability, anterior/posterior Drawer test). Claims were not reasonable and necessary if only pain or a subjective description of joint instability was documented.

p.  According to the Local Coverage Determination for Back Orthoses (LCD L33790), which was adopted nationally for services performed on or after October 1, 2015, back braces (L0450–L0651) were covered by Medicare only when they were ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or

6

related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine.

### Telemedicine

q. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or the telephone, to interact with a patient.

r. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or offered a membership program to customers.

s. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (i) the beneficiary was located in a rural or health professional shortage area; (ii) services were delivered via an interactive audio and video telecommunications system; and (iii) the beneficiary was at a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

t. Medicare regulations regarding telehealth concerned payment for telehealth consultation services only and did not prohibit ordering DME where the consultation itself was not billed to Medicare. However, some Medicare contractors took the position that the failure to comply with these requirements could inform their determination of medical necessity for DME ordered.

u.  Telemedicine membership programs generated revenue for telemedicine companies from customers who: (i) signed a contract with the telemedicine company; (ii) paid a set dollar amount per month, and (iii) paid a set dollar amount each time the customer has an encounter with a physician.

### The Conspiracy

2.  From in or about October 2017 through on or about April 9, 2019, in the District of New Jersey, and elsewhere, the defendant,

### ADARSH GUPTA,

did knowingly and willfully conspire and agree with Creaghan Harry, Lester Stockett, and others known and unknown to the Grand Jury, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program, as that term is defined under Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

### Goal of the Conspiracy

3.  It was the goal of the conspiracy for defendant ADARSH GUPTA and others to unlawfully enrich themselves by, among other things, (a) submitting and causing the submission of false and fraudulent claims to Medicare that were (i) procured through the payment of kickbacks and bribes, (ii) medically unnecessary, (iii) not eligible for Medicare reimbursement, and (iv) not provided as represented; (b) concealing the submission of false and fraudulent claims and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds

of the fraud for the personal use and benefit of the defendant and his coconspirators.

**Manner and Means of the Conspiracy**

4. The manner and means by which the defendant and his co-conspirators sought to accomplish the goal of the conspiracy included, among others, the following:

   a. ADARSH GUPTA certified to Medicare that he would comply with all Medicare rules and regulations, and federal laws, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and that he would comply with the Anti-Kickback statute. Despite this certification, ADARSH GUPTA proceeded to present or cause to be presented false and fraudulent claims for payment by Medicare as described below.

   b. ADARSH GUPTA agreed with the AffordADoc Network and others to write brace orders for Medicare beneficiaries in exchange for approximately $30 per patient consultation and to provide few, if any, medical treatment options for patients besides braces during the purported telemedicine consultations.

   c. ADARSH GUPTA gained access to Medicare beneficiary information for thousands of Medicare beneficiaries from the AffordADoc Network and others, in order for ADARSH GUPTA to sign brace orders for those beneficiaries.

   d. Neither ADARSH GUPTA nor the AffordADoc Network billed Medicare for telemedicine consultations with beneficiaries, but instead the

9

AffordADoc Network and others solicited illegal kickbacks and bribes from brace suppliers for brace orders that were signed by ADARSH GUPTA and others.

e.  The AffordADoc Network and others paid or caused payments to be made to ADARSH GUPTA and others to sign brace orders and cause the submission of brace orders that were medically unnecessary and not eligible for reimbursement from Medicare, in order to increase revenue for themselves and their co-conspirators.

f.  ADARSH GUPTA ordered braces that were medically unnecessary, for patients with whom he lacked a pre-existing doctor-patient relationship, without a physical examination, and frequently based solely on a short telephonic conversation with the beneficiary.

g.  Brace orders issued by ADARSH GUPTA at the direction of the AffordADoc Network were forwarded to suppliers for fulfillment. The suppliers submitted and caused the submission of claims to Medicare based on the orders signed by ADARSH GUPTA.

h.  ADARSH GUPTA and others falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of patient files, brace orders, and other records, all to support claims to Medicare for braces that were obtained through illegal kickbacks and bribes, medically unnecessary, ineligible for Medicare reimbursement, and/or not provided as represented.

i.  ADARSH GUPTA and others concealed and disguised the scheme by preparing and causing to be prepared false and fraudulent documentation, and submitting or causing the submission of false and fraudulent documentation to Medicare, including documentation in patient files and brace orders that (i) ADARSH GUPTA determined through his interaction

10

with a Medicare beneficiary that a particular course of treatment, including the prescription of braces, was medically necessary, (ii) ADARSH GUPTA performed a medical examination, and (iii) ADARSH GUPTA recommended to the Medicare beneficiary that they continue medical follow-up as part of an ongoing plan of care, when ADARSH GUPTA knew that he had not done so.

j.  ADARSH GUPTA and others submitted and caused the submission of false and fraudulent claims to Medicare in excess of approximately $5.4 million for braces that were procured through the payment of kickbacks and bribes, medically unnecessary, ineligible for Medicare reimbursement, and not provided as represented, for which Medicare paid approximately $2.9 million.

In violation of Title 18, United States Code, Section 1349.

## COUNTS TWO AND THREE
(Health Care Fraud)

5.  Paragraphs 1 and 4 of Count 1 of this Indictment are re-alleged here.

6.  On or about the dates set forth below as to each Count, in the District of New Jersey and elsewhere, the defendant,

**ADARSH GUPTA,**

in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare, by submitting or causing the submission of false and fraudulent claims to Medicare for orthotic braces that were medically unnecessary, ineligible for

11

Medicare reimbursement, and not provided as represented.

## Purpose of the Scheme and Artifice

7. The Grand Jury realleges Paragraph 5 of this Indictment as a description of the goal of the scheme and artifice.

## The Scheme and Artifice

8. The Grand Jury realleges and incorporates by reference Paragraph 4 of this Indictment as a description of the scheme and artifice.

## Execution of the Scheme and Artifice

9. On or about the dates specified below, in the District of New Jersey, and elsewhere, the defendant,

**ADARSH GUPTA,**

aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, attempted to and submitted or caused to be submitted, the following false and fraudulent claims to Medicare for orthotic braces that were medically unnecessary, ineligible for Medicare reimbursement, and not provided as represented, in an attempt to execute, and in execution of the scheme as described in Paragraphs 4 and 5 of the Indictment, with each execution set forth below forming a separate count:

| Count | Date | Description of Devices Ordered or Attempted | Approximate Amount Billed to Medicare |
|---|---|---|---|
| Two | 11/14/2018 | Shoulder brace and two ankle braces | $1,870.20 |
| Three | 4/13/2018 | Back brace, two knee braces, two suspension sleeves | $7,154.44 |

In violation of Title 18, United States Code, Sections 1347 and 2.

12

## COUNT FOUR
(False Statements Relating to Health Care Matters)

10. Paragraphs 1 and 4 of this Indictment are realleged here.

11. On or about March 22, 2019, in the District of New Jersey and elsewhere, the defendant,

**ADARSH GUPTA,**

did knowingly and willingly make and cause to be made materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, specifically Medicare, in that the defendant ADARSH GUPTA prepared and signed written orders for braces, including a letter of medical necessity, which falsely stated that:

    a. ADARSH GUPTA determined through his interaction with the Medicare beneficiary, J.W., that a particular course of treatment, including the prescription of braces, was medically necessary,

    b. ADARSH GUPTA performed a medical examination on J.W.,

    c. ADARSH GUPTA discussed J.W.'s back pain with J.W.,

    d. ADARSH GUPTA heard the Medicare beneficiary, J.W., describe J.W.'s back pain as "throbbing," and

   e. ADARSH GUPTA recommended to J.W. that J.W. "consult[] with a pain management physician to discuss and control her pain management regimen," when ADARSH GUPTA knew that he had not done so.

  In violation of Title 18, United States Code, Sections 1035(a) and 2.

## FORFEITURE ALLEGATION

  12. Upon conviction of one or more of the Federal health care offenses, as defined in Title 18, United States Code, Section 24, charged in Counts One through Four of this Indictment, the defendant,

**ADARSH GUPTA,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), all property, real or personal, the defendant obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the Federal health care offense charged in each count, the aggregate value of which totaled $111,150, and all property traceable to such property.

<u>Substitute Assets Provision</u>

  13. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty;

14

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18 United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A True Bill,

███████████████
Foreperson

_____
RACHAEL A. HONIG
Attorney for United States,
Acting Under Authority
Conferred by 28 U.S.C. § 515

_____
DANIEL KAHN
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

JACOB FOSTER
Assistant Chief
Criminal Division, Fraud Section
United States Department of Justice

_____
DARREN HALVERSON
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

CASE NUMBER: __2:20-cr-00773_____

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

v.

**ADARSH GUPTA**

INDICTMENT FOR

18 U.S.C. §§ 1347, 1349, 1035, and 2

**A True B**̶̶̶̶̶̶̶̶̶

**Foreperson**

RACHAEL A. HONIG
ATTORNEY FOR UNITED STATES,
ACTING UNDER AUTHORITY CONFERRED
BY 28 U.S.C. § 515

DARREN C. HALVERSON
TRIAL ATTORNEY
NEWARK, NEW JERSEY
202-880-2233